# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JEFFERSON MORLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Case No. 03-2545 (RJL)** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES CENTRAL** | ) | |
| **INTELLIGENCE AGENCY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION
(March **30**, 2010) [# 88 and 95]

Plaintiff, Jefferson Morley, brings this action against the Central Intelligence Agency ("CIA" or "Agency") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.* (2000), seeking records pertaining to deceased CIA operations officer, George Efythron Joannides. On remand from the Court of Appeals, the case is now before this Court on the parties' renewed Cross-Motions for Summary Judgment. After careful review of the motions, applicable law, and the entire record herein, the defendant's motion is GRANTED and plaintiff's motion is DENIED.

## BACKGROUND

The facts of Morley's case are set out in detail in prior opinions of this Court and the Court of Appeals. *See Morley v. CIA*, 453 F. Supp. 2d 137 (D.D.C. 2006), *aff'd in part, rev'd in part*, 508 F.3d 1108 (D.C. Cir. 2007). Accordingly, they will only be summarized here to the extent they bear on the motions decided in this Opinion.

Plaintiff is a journalist and news editor who has written about the assassination of President John F. Kennedy. *See Morley*, 508 F.3d at 1113. On July 4, 2003, he submitted a FOIA request to the CIA seeking "all records pertaining to CIA operations officer George Efythron Joannides, (also known as 'Howard,' 'Mr. Howard' or 'Walter Newby'), including, but not limited to" seventeen specific categories of records. (Compl. Ex. 1 ("Morley Letter") at 1-3.). Morley's interest in Joannides stems from his belief that the former CIA officer was "uniquely well-positioned to observe and report" on the assassination of President John F. Kennedy. (Morley Letter at 3.) Morley believes that the documents he requested "promise to shed light on the confused investigatory aftermath of the assassination." (*Id.*)

The CIA initially responded to Morley's request by telling him that records relating to the Kennedy assassination had been transferred to the National Archives and Records Administration ("NARA") and that he should direct his FOIA request there. *See Morley*, 508 F.3d at 1113. After further review, the CIA reconsidered its position and, over the course of several productions, sent Morley three complete documents, two documents in segregable form, and 113 redacted documents. *See id.* at 1114. The CIA justified the redactions under FOIA Exemptions 1, 2, 3, 5, 6, 7(C), and 7(E).[1] *Id.* Additionally, the CIA withheld material in its entirety under Exemptions 1, 2, 3, 5, 6, 7(C), 7(D), and 7(E). *See id.* It also declined to confirm or deny the existence of certain records requested by Morley. *See id.*

---

[1] FOIA exemptions are identified here by the subpart number they are assigned in the statute. For instance, FOIA Exemption 1 is based on the exemption found in 5 U.S.C. § 552(b)(1), and so on. *See* 5 U.S.C. § 552(b)(1) – (9).

Based on the CIA's 2004 document searches and productions, this Court granted summary judgment in the agency's favor because it had conducted an adequate search, sufficiently explained any withheld information, and properly invoked the FOIA exemptions it claimed. *See Morley*, 453 F. Supp. 2d at 144-57. On review, our Circuit Court affirmed in part and reversed in part. *See Morley*, 508 F.3d at 1113. Specifically, the Court of Appeals remanded the case for the CIA to: (1) search its operational files, which it had not done previously, *id.* at 1116-19; (2) search records it transferred to NARA, *id.* at 1119-20; (3) supplement its explanation regarding missing monthly reports Morley believes should have been filed by Joannides, *id.* at 1120-21; (4) provide additional details describing the scope of the search it conducted, *id.* at 1121-22; (5) explain to this Court's satisfaction why withheld information was not segregable, *id.* at 1123; (6) substantiate its *Glomar* response, whereby it refused to confirm or deny the existence of certain records requested by Morley, *id.* at 1126; and (7) provide additional justification for withholding documents under FOIA exemptions 2, 5, and 6, *id.* at 1124-28.

In response to the Court of Appeals' decision, the CIA in 2008 conducted additional searches and produced additional material to Morley. In particular, on April 28, 2008, the CIA released 113 responsive records, and on August 6, 2008, another 293 responsive records. (Def. Mot. [# 88] at 5.) The CIA has since renewed its motion for summary judgment on the basis that it fully complied with the Court of Appeals' remand. (*Id.*) Morley opposes the motion and filed his own cross-motion for summary judgment. (Pl.'s Cross-Mot. [# 95].) Both motions are now fully briefed.

## LEGAL STANDARD

In response to a FOIA request, an agency must conduct a "reasonable" search for

responsive records. *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 318

(D.C. Cir. 2006). An agency defending against FOIA litigation can prevail on summary

judgment if it shows "beyond material doubt . . . that it has conducted a search reasonably

calculated to uncover all relevant documents." *Weisberg v. U.S. Dep't of Justice*, 705

F.2d 1344, 1351 (D.C. Cir. 1983). "The Court applies a 'reasonableness' test to

determine the 'adequacy' of a search methodology, consistent with congressional intent

tilting the scale in favor of disclosure." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20,

27 (D.C. Cir. 1998) (citations omitted). Furthermore, the Court "impose[s] a substantial

burden on an agency seeking to avoid disclosure" based on a FOIA exemption. *Vaughn

v. Rosen*, 484 F.2d 820, 828 (D.C. Cir. 1973).

Importantly, the Court may award summary judgment solely on the basis of

information provided by the department or agency in affidavits or declarations. *See

Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). Under the law of

our Circuit, "in the absence of countervailing evidence or apparent inconsistency of

proof, affidavits that explain in reasonable detail the scope and method of the search

conducted by the agency will suffice to demonstrate compliance with the obligations

imposed by the FOIA." *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982). When an

agency's affidavits demonstrate that "no material facts are in dispute," and if the agency

"demonstrates 'that each document that falls within the class requested either has been

produced . . . or is wholly exempt from the Act's inspection requirements,'" then it is

entitled to summary judgment. *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)).

## ANALYSIS

### 1. Adequacy of the CIA's Searches

The Court of Appeals held that the CIA's 2004 searches were inadequate in several respects. First, the Court of Appeals disagreed with the CIA that "operational files" were exempt from disclosure in this case under the CIA Act, 50 U.S.C. § 431(a). *See Morley*, 508 F.3d at 1116-19. As a result, in 2008, the CIA conducted new searches of its operational files. On August 6, 2008, the agency produced to Morley 293 documents found in these new searches; 29 of these documents were released in full and 264 were redacted in part. (Declaration of Delores M. Nelson ("Nelson Decl.") ¶ 54.) Additionally, the CIA withheld 293 documents in their entirety under FOIA exemptions 1, 2, 3, 5, and 6. (*Id.*)

The CIA has now explained with sufficient detail how it crafted its search of the three locations which comprise the statutory definition of the agency's "operational files."[2] (*Id.* ¶ 27-39.) Specifically, the CIA listed its initial search terms, described the amount of material returned by the initial search, and the criteria by which it determined whether the records it reviewed were responsive to plaintiff's request. (*Id.*) Not

---

[2] "Operational files" are defined as files of the Directorate of Operations ("NCS") "which document the conduct of foreign intelligence or counterintelligence operations or intelligence or security liaison arrangements or information exchanges with foreign governments or their intelligence or security services," files of the Directorate for Science and Technology ("DS&T") "which document the means by which foreign intelligence or counterintelligence is collected through scientific and technical systems," and files of the Office of Personnel Security ("OS") "which document investigations conducted to determine the suitability of potential foreign intelligence or counterintelligence sources." 50 U.S.C. § 431(b).

surprisingly, Morley is unhappy with the scope of the CIA's search. But to the extent

Morley takes issue with the CIA's decision not to apply these search terms to any other

agency directorates, (Pl.'s Cross-Mot. at 28), his argument must fail because it neglects

the explicit statutory definition of "operational files," which is limited to the three

directorates searched by the CIA. 50 U.S.C. § 431(b). Because the CIA has described

the search of its "operational files" with more than "relative[] detail[]," in "good faith,"

and in a "nonconclusory" way, summary judgment in its favor is appropriate on this

point. *See Morley*, 508 F.3d at 1116 (quoting *Goland*, 607 F.2d at 352).

The Court of Appeals also found the CIA's 2004 searches to be deficient in that

they did not include certain records transferred to NARA. *Morley*, 508 F.3d at 1119-20.

The CIA has since searched the NARA files and produced 113 of them to Morley.

(Nelson Decl. ¶ 41-43.) Of these 113 documents, 88 were produced in full and 25 were

produced with partial redactions; for the redactions, the CIA claims FOIA exemptions 1,

2, 3, and 6. (*Id.* ¶ 42.) The CIA included in its search the roughly 1,100 documents

housed in NARA's protected collection – not scheduled for public release until 2017 –

although no responsive records were found in this collection. (*Id.* ¶ 43.) Morley does not

challenge the adequacy of this search; indeed, the NARA collection is a discrete set of

documents which the CIA has reviewed in full. (*Id.* ¶ 40-43.) Accordingly, the CIA is

entitled to summary judgment on the adequacy of its search of the NARA records.

Additionally, the Court of Appeals was not satisfied with the CIA's explanation

concerning the whereabouts of 17 monthly reports which Morley believes Joannides filed

between 1962 and 1964. *See Morley*, 508 F.3d at 1120-21. Regrettably, Morley has read

the Court of Appeals' opinion as a broad invitation to once again mount his argument as to why these reports must have been filed in the first place, why they should now be considered "missing," and why their absence indicates an inadequate search on the part of the CIA. (Pl.'s Cross-Mot. at 22-28.) He is mistaken. It was not an accident that the Court of Appeals began its discussion of the monthly reports by stating, "Morley is less persuasive in contending that the search was inadequate because there are certain documents that he suspects the CIA has in its possession but withheld." *Morley*, 508 F.3d at 1120.

The actual reason the Court of Appeals remanded on this point was that the CIA failed to explain directly to the Court, or Morley, its search for these reports and its resulting belief that they never existed. *Id.* at 1121. Instead, the CIA had merely pointed to a memorandum it previously wrote to NARA which the agency claimed "may" explain why the reports did not exist. *Id.* While the CIA continues to point to the NARA memorandum here, it now details on the record its new search efforts to uncover the monthly reports. (Nelson Decl. ¶ 44-47.) For instance, in the course of the agency's review of its operational files, the CIA searched for the monthly reports with three search terms which the Court finds were "reasonably calculated to uncover all relevant documents." *Nation Magazine v. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)). Morley's continued disbelief in the agency's explanation is not enough to create a material issue of fact on this point. He offers "nothing more than 'mere speculation that as yet uncovered documents might exist,' which is not enough to 'undermine the determination that the

agency conducted an adequate search for the requested records." *Morley*, 508 F.3d at 1120 (quoting *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004)).

In addition to remanding the case for additional explanation on the scope of its search for the specific monthly reports, our Circuit Court remanded for the CIA to expand its general description of its overall search. *See id.* at 1122. The Court of Appeals found that the CIA's prior declaration in support of its first Motion for Summary Judgment was insufficient because the bulk of it offered only a "general explanation of how the agency responds to all FOIA requests." *Id.* The CIA's new declarations remedy this shortfall. Together, the declaration and supplemental declaration filed by Delores Nelson, Chief of the Public Information Programs Division at the CIA, explain in sufficient detail the agency's searches in response to Morley's request.

For example, with respect to the search strategy used by the agency's NCS directorate, the Nelson declaration sets out the 14 search terms which the agency used in varying formulations. (Nelson Decl. ¶ 31.) The declaration further explains the amount of material retrieved by these searches, as well as the criteria by which those who manually reviewed the material determined whether a document was responsive or not. (*Id.* ¶ 31-33.) Similar explanations are provided for searches of the other directorates and NARA records. (*Id.* ¶¶ 35, 37-39, 41.) Furthermore, Nelson's supplemental declaration adequately explains the agency's search of "soft" file material, which the Court of Appeals held was previously lacking. *See Morley*, 508 F.3d at 1121. As Nelson explains, "soft files" usually relate to personnel matters and are kept by the office to which an employee is assigned. (Supplemental Declaration of Delores M. Nelson

("Supp. Nelson Decl.") [# 98-2] ¶ 8.) "Soft files" are temporary by nature; appropriate material from a "soft" file is transferred to an employee's official file for longer term storage and the rest of the file is destroyed when the employee transfers assignment, resigns, or retires. (*Id.* ¶ 7-8.) Thus, when the CIA searched Joannides's official file, it would have uncovered any responsive "soft" file material which still exists. (*Id.* ¶ 9.)

Morley's primary objection to the general scope of the CIA's search appears to be that it neglected to use two search terms which Morley feels are particularly significant. Specifically, Morley contends that Joannides was involved in two covert operations identified by the cryptonyms AMBARB and AHMINT, and he argues that the CIA's search is inadequate to the extent it did not explicitly search for these files. (Pl.'s Cross-Mot. at 21-22.) This objection is unavailing, however, because the CIA has explained how it searched for all records relating to Joannides. (Supp. Nelson Decl. ¶ 9.) Accordingly, the presence or absence of these search terms does not impact this Court's finding that the CIA conducted an adequate search.

## 2. The FOIA Exemptions

In an effort to comply with the Court of Appeals' remand, the CIA now provides additional justification for withholding documents from its 2004 search results under FOIA Exemptions 2, 5, and 6. In addition, the CIA seeks to justify its use of FOIA Exemptions 1, 2, 3, 5, and 6 to withhold new materials uncovered in the agency's 2008 searches. I find that the CIA's Nelson declaration and *Vaughn* index[3] adequately justify

---

[3] The CIA's first *Vaughn* index, which accompanied the agency's first set of productions and which was challenged by Morley on appeal, was held to be sufficient. *Morley*, 508 F.3d at 1122-

its use of these Exemptions to withhold information from both sets of search results. Additionally, after careful review of the Dorn and Nelson Declarations, as well as the *Vaughn* indexes submitted by the CIA, I find that the agency properly segregated the material it withheld from that which could be released. *See Morley*, 508 F.3d at 1123.

### a. Exemption 1

Exemption 1 applies to protect the disclosure of records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). When an agency invokes Exemption 1, courts have been instructed by Congress to give "substantial weight" to agency determinations concerning national security. *Halperin v. CIA*, 629 F.2d 144, 147-148 (D.C. Cir. 1980). "If the agency's affidavits describe the withheld information and the justification for withholding with reasonable specificity, demonstrating a logical connection between the information and the claimed exemption, and if the affidavits evidence neither bad faith on the part of the agency nor a conflict with the rest of the record, the agency is entitled to summary judgment." *Salisbury v. United States*, 690 F.2d 966, 970 (D.C. Cir. 1982).

Here, the CIA has invoked Exemption 1 to justify its withholding information from the 2008 searches classified as either "top secret," "secret," or "confidential" under

---

23. The CIA has produced another *Vaughn* index to correspond to its second set of productions – those undertaken in 2008 in response to the Court of Appeals' decision. Because this *Vaughn* index conveys the same kinds of information that the Court of Appeals found sufficient, the Court finds this index sufficient as well.

Executive Order 12958. (Def. Mot. at 13-14.) The Nelson declaration describes in reasonable detail its reasons for this withholding; specifically, the CIA claims it withheld the locations of covert CIA installations, the names of CIA employees and clandestine human intelligence sources, certain intelligence methods, and agency cryptonyms. (*Id.* at 14-15.) Morley objects to the CIA's use of this exemption on the grounds that the withheld material either should not remain classified under Executive Order 12958 or because it has already been disclosed to the public. (Pl.'s Cross-Mot. at 37-40.)

Our Circuit has already noted in this case, however, that "little proof or explanation is required beyond a plausible assertion that information is properly classified." *Morley*, 508 F.3d at 1124. Furthermore, "[p]rior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Id.* (emphasis in original) (quoting *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007)). Thus, Morley's arguments for declassification of this material are no more convincing now than they were to the Court of Appeals, who already accepted the agency's "plausible assertion" of proper classification. Nor is his contention that Exemption 1 does not apply because the CIA has already disclosed the same material. Morley is again "[u]nable to point to specific information that was previously released and is now withheld"; thus, he fails to meet the specificity requirement of this Circuit. *Id.*

### b. Exemption 2

Exemption 2 protects from disclosure records that are "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). There are

two types of information protected under this exemption: information for which "disclosure may risk circumvention of agency regulation," and information which "relates to trivial administrative matters of no genuine public interest." *Schwaner v. Dep't of Air Force*, 898 F.2d 793, 794 (D.C. Cir. 1990) (internal quotations omitted).

The Court of Appeals held that the CIA offered insufficient justification for its use of this exemption to redact portions of nine documents found in the 2004 searches. *Morley*, 508 F.3d at 1125. The CIA, however, has since supplemented its explanation in the Nelson declaration. It turns out that the information redacted out of the first of the nine documents references a CIA security practice, which if disclosed to the public, could lead to its circumvention. (Nelson Decl. ¶ 98.) Likewise, the second document contained sensitive information on the agency's security clearance process, the third, information on the substance of the CIA's pre-travel security briefings, and the remainder, information gathered during the Joannides's background check. (Nelson Decl. ¶ 99-101.) Nelson further declares that the disclosure of any of this information could lead, through a "mosaic" approach, to circumvention of the CIA's regulations on the security clearance process, pre-travel briefings, and agency background checks. (*Id.* ¶¶ 99-101, 103.) According to our Circuit, these are the kinds of assertions – previewing the "particularized harm" that might result from disclosure – which enable this Court to "perform a searching *de novo* review." *Morley*, 508 F.3d at 1125-26 (quoting *Church of Scientology of Cal., Inc. v. Turner*, 662 F.2d at 784, 785-86 (D.C. Cir. 2007)). Thus, with

respect to the nine redacted documents produced in 2004, the CIA has now met its burden and established its justification for invoking the "circumvention" prong of Exemption 2.[4]

The CIA has also invoked Exemption 2 to justify withholding in part or full documents found in the 2008 searches. For some of these documents, the CIA claims the information is similar to what was withheld from the 2004 productions in that its release would lead to circumvention of agency regulation. (Nelson Decl. ¶ 102.) With respect to these documents, the CIA explains in sufficient detail how disclosure of the withheld information could lead to circumvention of CIA security procedures, (*id.* ¶ 103). Furthermore, the CIA explains how information withheld in the remainder of the Exemption 2 documents is too "trivial" to possess any public interest. The Court is convinced that the information withheld here, like internal employee rating criteria, details of administrative house- and file-keeping, and other personal employee data, falls under the "trivial" prong of Exemption 2. (Nelson Decl. ¶ 104-05.) Accordingly, summary judgment is proper as well for the Exemption 2 documents withheld from the 2008 productions.

### c. Exemption 3

Like Exemption 1, this Exemption relates to matters of national security. It covers records that are "specifically exempted from disclosure by statute . . . if that statue-- (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (ii) establishes particular criteria for withholding or refers to

---

[4] In any event, Morley does not oppose the CIA's use of the "circumvention" prong of exemption 2. Instead, he mistakenly focuses on what he believes to be the agency's improper use of the "trivial" prong of exemption 2. (Pl.'s Cross-Mot. at 39-40.)

particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A). Because the Court

of Appeals affirmed the CIA's use of Exemption 3 for the 2004 searches, *Morley*, 508

F.3d at 1125-26, the only issue here is whether the CIA has properly invoked the

exemption again for the 2008 searches. It has.

Not surprisingly, agencies are owed special deference when they invoke

Exemption 3, just as they are with Exemption 1. *See Halperin*, 629 F.2d at 147-148.

Indeed, as our Circuit has held, "Exemption 3 differs from other FOIA exemptions in that

its applicability depends less on the detailed factual contents of specific documents; the

sole issue for decision is the existence of a relevant statute and the inclusion of withheld

material within the statute's coverage." *Ass'n of Retired R.R. Workers v. U.S. R.R. Ret.*

*Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987). Here, the CIA relies on two relevant statutes to

justify its decision: the National Security Act of 1947, and the Central Intelligence

Agency Act of 1949. (Nelson Decl. ¶ 106.) Given the "special deference" owed to the

CIA's affidavit concerning the inclusion of the withheld material within these statutes'

coverage, (Nelson Decl. ¶ 106-11), the agency is entitled to summary judgment on its use

of Exemption 3. *See Morley*, 508 F.3d at 1126.

### d. Exemption 5

Exemption 5 protects from disclosure "inter-agency or intra-agency

memorandums or letters which would not be available by law to a party other than an

agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This Exemption applies to

information that would otherwise be subject to an evidentiary privilege claim, and thus

protected from disclosure, in the context of civil discovery. *Rockwell Int'l Corp. v. U.S.*

*Dep't of Justice*, 235 F.3d 598, 601 (D.C. Cir. 2001). One such privilege is the deliberative process privilege, which protects the "decision making processes of government agencies." *NLRB v. Sears Roebuck & Co.*, 421 U.S. 132, 150-51 (1975). The Court of Appeals found the CIA's first invocation of Exemption 5 to withhold two documents from the 2004 productions to be "conclusory" and thus insufficient. *Morley*, 508 F.3d at 1127. Thus, "on remand the CIA must supply at least 'the minimal information necessary to make a [privilege] determination.'" *Id.* (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980). In addition, because the CIA withheld information from the 2008 searches under this Exemption, it must justify its new withholding as well. It has done both.

The CIA's supplemental explanation of why it invoked Exemption 5 to withhold two 2004 documents provides the information found lacking by the Court of Appeals. For instance, the Court of Appeals found it impossible to determine whether the withheld information was "deliberative," and thus protected, because the agency had not offered enough of an explanation to demonstrate that the material "reflect[ed] the personal opinions of the writer rather than the policy of the agency." *Id.* (quoting *Coastal States Gas*, 617 F.2d at 866.) But now, the CIA explains that material withheld from the first 2004 document contained handwritten notes "regarding Joannides' familial background and his suitability for a security clearance." (Nelson Decl. ¶ 116.) Material withheld from the second document, which also related to Joannides's background check, included "recommendations concerning the waiver of certain reinvestigation methods and practices." (*Id.*) Clearly, the CIA's description of this information is sufficient to

demonstrate that what was withheld indeed concerned "pre-decisional" deliberations which preceded the ultimate agency action granting Joannides his security clearance. *Morley*, 508 F.2d at 1127. Moreover, these kinds of deliberations are precisely the type covered by the deliberative process privilege. To be sure, CIA employees must be free to engage in candid and personal deliberations regarding the ultimate grant or denial of a potential agent's security clearance. *See Coastal States Gas*, 617 F.2d at 866.

Morley's objection that this information is not protected because its disclosure would not be "likely in the future to stifle honest and frank communications within the agency" is simply incorrect. (Pl.'s Cross-Mot. 42-43.) First, Morley betrays his misunderstanding of the privilege when he contends that no parties would be embarrassed here because the documents are thirty years old and one of the document's recipients has yet to be disclosed. Simply put, the privilege is not intended merely to prevent embarrassment to those who took part in a given deliberation; rather, as *Coastal States Gas* makes clear, it is also intended to prevent chilling *future* government employees from engaging in frank discussions during the deliberative process. *See* 617 F.2d at 866. Second, Morley is simply too speculative when he argues that the appearance of the term "OK" on one of the documents renders it final rather than pre-decisional. All the Court of Appeals required in this case was for the CIA to supply the minimal information required to make a privilege determination, *Morley*, 508 F.3d at 1127, and for the reasons given, the agency has more than complied.

For similar reasons, the CIA is entitled to summary judgment on the material it withheld under Exemption 5 from the 2008 productions. It appears the CIA invoked this

Exemption to withhold five documents in their entirety from the 2008 productions, (Nelson Decl. ¶ 118), although as the *Vaughn* index indicates, these documents were withheld under other Exemptions as well. In any event, between the Nelson Declaration and the *Vaughn* index, there is more than enough detail for the Court to determine that what was withheld pertained to pre-decisional consideration of Joannides's suitability for employment. Because discussion of an employee's suitability is no doubt part of the "give-and-take of the consultative process," it is "deliberative" and thus subject to the privilege. *Coastal States Gas*, 617 F.2d at 866.

### e. Exemption 6

This Exemption protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). As our Court of Appeals noted, "[t]his exemption creates a 'heavy burden'; indeed, 'under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Morley*, 508 F.3d at 1127 (quoting *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 261 (D.C. Cir. 1982)). Based on this "heavy burden," the Court of Appeals found the CIA's explanation of its reasons for invoking Exemption 6 to be lacking. Specifically, it found the Dorn declaration to be too conclusory when it asserted, without more, that the withheld material was biographical. *Id.* at 1127-28. On remand, the CIA was instructed to explain how disclosure of this biographical information would "constitute a 'clearly unwarranted' invasion of personal privacy," by further explaining the nature of the privacy interests in this data and the consequences that may ensue from its disclosure. *Morley*, 508 F.3d at 1128 (internal

quotations omitted). Additionally, since the CIA invoked this Exemption for certain documents in the 2008 productions, it must justify those withholdings.

It is now clear that the CIA is justified in its use of Exemption 6 to withhold personal biographical information from both the 2004 and 2008 productions. Indeed, much of what the CIA withheld was personal data like social security numbers, dates and locations of birth, tax information, addresses, and phone numbers. (Nelson Decl. ¶ 122-37.) As the CIA explains in reasonable detail, it withheld this kind of information for Joannides's immediate family members, emergency contacts, colleagues, and intelligence sources, because the consequences to flow from its release could be damaging. For instance, heightened media contact and scrutiny would no doubt be a "clearly unwarranted" invasion of Joannides's children's personal privacy. (Nelson Decl. ¶ 138.) Likewise, Joannides's colleagues and sources might expect heightened media scrutiny, or, worse, some form of retribution for their past work. (*Id.* ¶ 140.) This explanation suffices to invoke Exemption 6; thus, the agency is entitled to summary judgment for these documents.

### 3. The CIA's Glomar Response

Finally, the Court of Appeals found the CIA's prior explanation for its *Glomar* response to be unsubstantiated. *Morley*, 508 F.3d at 1126. A *Glomar* response relies on Exemptions 1 and 3 to protect the mere fact of a document's existence. *Larson v. Dep't of State*, 565 F.3d 857, 861 (D.C. Cir. 2009). Thus, an agency typically invokes a *Glomar* response to refuse to confirm or deny the existence of records when divulging

such information would itself constitute information protected by Exemptions 1 and 3. *Id.* (citing *Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976)).

When the CIA responded to Morley's FOIA request in 2004, it stated, "[w]ith respect to that portion of your request seeking records regarding Mr. Joannides['s] participation in any covert project, operation, or assignment, unless of course previously acknowledged, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to your request." (Nelson Decl. ¶ 58.) It then explained with respect to intelligence sources withheld under Exemption 3 that "[a]n official acknowledgment of [clandestine activity] could jeopardize the source's career, family, or even his life." *Morley*, 508 F.3d 1126 (alteration in original). Our Court of Appeals, however, found this explanation to be merely an "allusion to the need for a *Glomar* response" and therefore not "linked to the *Glomar* response." *Id.* Thus, the Court of Appeals remanded for the agency to explain "in reasonably specific detail the danger to intelligence sources and methods if the existence of responsive records were disclosed." *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 373 (D.C. Cir. 2007)).

The CIA has since offered a sufficiently detailed explanation. As the Nelson Declaration notes, "[i]ntelligence activities lie at the core of the CIA's functions." (Nelson Decl. ¶ 65.) It is rather apparent that "if the CIA admits it possesses records regarding the CIA's participation in a covert action, this disclosure could reasonably be expected to result in damage to the United States' foreign relations with those countries in which the covert actions occurred." (*Id.* ¶ 66.) Denial of the existence of records with respect to Joannides's covert operations could have similarly deleterious effects. (*Id.* ¶

67.) Thus, the CIA continues to assert a *Glomar* response with respect to all records relating to Joannides's covert operations, except for those relating to two covert projects which the CIA has already publicly acknowledged: one, referred to by the cryptonym JMWAVE, and the second, service as a CIA representative to the House of Representatives Select Committee on Assassinations from 1978 to 1979. (Nelson Decl. ¶ 59.)

Morley, nonetheless, objects to the scope of the CIA's *Glomar* response because he believes the agency has already declassified records which document Joannides's involvement in the covert AMBARB and AHMINT operations. (Pl.'s Cross-Mot. at 21.) Based on this belief, he contends that the CIA cannot continue to confirm or deny their existence. (*Id.* at 21-22.) I disagree. The CIA denies it ever officially declassified or acknowledged Joannides's participation in these operations. (Def. Opp'n to Pl.'s Cross-Mot. [# 98] at 6.) And notwithstanding Morley's allegations to the contrary, he fails to point to relevant portions of any document officially recognizing Joannides's participation in these operations. Given the deference owed to the CIA on matters of national security, *Halperin*, 629 F.2d at 147-148, the Court accepts the CIA's statement that Joannides has only been confirmed to be a member of two covert operations, neither of them AMBARB or AHMINT. Thus the CIA's *Glomar* response is sufficiently detailed and appropriate in scope.

## CONCLUSION

For all these reasons, the Court concludes that the CIA has complied with the terms of the Court of Appeals' remand. Furthermore, with respect to the CIA's 2008

productions, the agency has conducted adequate searches and justified any withholdings under applicable FOIA exemptions. Thus, summary judgment is entered in the CIA's favor. An appropriate Order will issue with this Memorandum.

RICHARD J. LEON
United States District Judge