UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JEFFERSON MORLEY,                          :
                                           :
          Plaintiff,                       :
                                           :
    v.                                     :      Civil Action No. 03-2545 (RCL)
                                           :
CENTRAL INTELLIGENCE AGENCY                :
                                           :
                                           :
          Defendant                        :


SUPPLEMENTAL MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS


STATEMENT OF THE CASE


The facts relevant to plaintiff's supplemental memorandum in support of plaintiff's motion for attorney fees were detailed in considerable length in Plaintiff's Renewed Motion for an Award of Attorney's Fees and Costs, pp. 1-19. *See* id., ECF 135 at 3-21, as well as in two prior opinions by this Court and two by the Court of Appeals. The facts set forth in ECF 135 are incorporated herein by reference. The facts set forth below are supplemental to the facts set forth in Morley's prior motions for an award of attorneys' fees. They relate to two subsequent developments: (1) the opinion of the Court of Appeals issued January 21, 2016 in *Morley v. C.I.A.*, D.C. Cir. No. 14-5230, and the submission of the Declaration of Dan Hardway, who as an investigator for the House Select Committee on Assassinations ("HSCA") investigated matters relevant to Morley's request for records pertaining to CIA case officer George Joannides

("Joannides") and the assassination of President John F. Kennedy, matters which were the subject of Morley's Freedom of Information Act ("FOIA") request that led to this lawsuit.

A. The D.C. Circuit's 2016 Decision in Morley v. C.I.A.

In *Morley v. C.I.A.*, D.C. Cir. 14-5230 (D.C. Cir. 2016) ("hereafter referred to as either *Morley 2016* or "slip op."), the Court of Appeals held that this Court had "improperly analyzed the public-benefit factor by assessing the public value of the information *received* rather than "the potential public value of the information sought . . . ." Id. citing *Davy v. CIA*, 550 F.3d 1155, 1159 (D.C. Cir. 2008)("*Davy*"). Seeking to remove any doubt about its core holding, the Court of Appeals asserted:

> Lest there be any uncertainty, we clarify that the
> public-benefit factor requires an *ex ante* assessment
> of the potential public value of the information requested,
> with little or no regard to whether any documents
> supplied prove to advance the public interest.

*Morley 2016*, Slip op. at 5 (italics in original).

In evaluating the weight of the potential public benefit conferred by a request for information on a matter of public concern, the Court noted that "[t]he nature of the subject that the request seeks to illuminate is obviously important." Id. With regard to the primary subject matter at issue in this case, the Court declared: "Where that subject is the Kennedy assassination—an event    with few rivals in national trauma and in the array of passionately held conflicting explanations—showing potential public value is relatively easy." Id. at 5-6 (emphasis added).

The Court of Appeals expressly found that: "Morley's request had potential public value." Id. at 6 (emphasis added). In support of this finding, the Court of Appeals noted that it was supported by several critical facts: "Morley has proffered—and the CIA has not disputed—

that Joannides served as the CIA case officer for a Cuban group, the DRE, with whose officers Oswald was in contact prior to the assassination. Travel records showing a very close match between Joannides' and Oswald's times in New Orleans might, for example, have (marginally) supported one of the hypotheses swirling around the assassination." Id. Furthermore, the Court of Appeals noted that it had "previously determined that Morley's request sought information 'central' to an intelligence committee's inquiry into the performance of the CIA and other federal agencies in investigating the assassination." Id., citing *Morley v. CIA*, 508 F.3d 1108, 1118 (D.C. Cir. 2007. In view of these circumstances, the Court concluded that "there was at least a modest probability that Morley's request would generate information relevant to the assassination or later investigations." Id.

Turning to another issue, the Court of Appeals noted that this Court had "suggested that Morley is not entitled to fees incurred in connection with documents that were available to him (and the public generally) in the [National] Archives." Id., citing *Morley*, 59 F. Supp. 3d at 156. However, the Court of Appeals distinguished this case from *Tax Analysts v. U.S. Dep't of Justice*, 965 F.2d 1092, 1094-95 (D.C. Cir. 1992). It said that "unlike the requester in *Tax Analysts*, who sought publicly available tax decisions, Morley had no reason to believe that all records pertaining to Joannides would be available." Id. The Court also took note of the claim of Morley's counsel at oral argument "that extracting documents of this sort from the Archives is a laborious and unreliable process—and that some documents in the Archives cannot be electronically located because of missing record identification forms, which record information about each document for input into an electronic database." Id. at 7. In view of this, the Court instructed that:

> Before denying any fees on the ground
> that some of the documents were available in the

> Archives, the district court should consider (1)
> whether fees incurred in connection with such
> documents are segregable and, if so, (2) whether the
> difficulties recited above nonetheless militate against
> denial of fees for such documents

Id.

Finally, the Court of Appeals noted that "[f]ollowing the prior remand on the fees issue,

the district court declined to reevaluate any factors other than public benefit, or to rebalance the

factors, despite this court's suggestion in *Davy* that the first three factors are all addressed to the

distinction 'between requesters who seek documents for public informational purposes and those

who seek documents for private advantage.'" *Davy*, 550 F.3d at 1160.

In light of this, the Court instructed that "[o]n remand, the district court should consider

the remaining factors and the overall balance afresh." Id.

B. The District Court's Instructions on Remand

On April 22, 2016, this Court issued a Minute order regarding the January 21, 2016

remand order from the Court of Appeals. This Court instructed that "plaintiff shall submit a

supplemental brief in support of his request for attorney's fees and costs that is consistent with

the analysis provided by the Court of Appeals." Plaintiff Morley complies with this directive in

the argument section which follows.

## ARGUMENT

## I. MORLEY IS ENTITLED TO AN AWARD OF ATTORNEY'S FEES

A. Consideration of the Four-Factors Test on Remand

Applying its *ex ante* analysis to the public benefit factor, the Court of Appeals concluded

that "there was at least a modest probability that Morley's request would generate information

relevant to the assassination or later investigations." Slip Op. at 6. Noting that this Court had

not dealt with the applicability of the remaining three factors in light of *Davy*, it then instructed that "[o]n remand, the district court should consider the remaining factors and the overall balance afresh." Id. at 7.

While the Court of Appeals' ruling is dispositive on the issue of whether the public benefit factor weighs in Morley's favor—it clearly and unequivocally does—it remains an issue to be discussed by the parties and weighed by this Court because the Court of Appeals instructed that the "overall balance" of the four factors must be considered "afresh." A fresh balancing of the public benefit factor is necessarily included in an "overall balancing" of the four factors.

B. Evaluating the Weight to Be Given the Public Benefit Factor

1. Effect on the Litigation

A number of considerations affect the weight to be assigned to the public benefit factor. The First is the effect of the litigation. The "'effect of the litigation' inquiry is properly understood as asking simply whether the litigation has caused the release of requested documents, without which the requester cannot be said to have substantially prevailed." *Morley 2016* at 5. Thus, assessing "'the value of the litigation' 'presents a variation on' the question whether the plaintiff has 'substantially prevail[ed]'"). Id., quoting *Davy* at 1159. Thus, if the litigation results in the release of document, this confers a public benefit. Here, as in *Davy*, records were released as a result of the litigation. Indeed, but for the litigation, nothing at all would have been released.

2. The Nature of the Subject of the Request Is Obviously Important

In performing the *ex ante* analysis of the potential public benefit which may be derived from the request, "[t]he nature of the subject that the request seeks to illuminate is obviously important." Id. This is not new law. The D.C. Circuit has previously cited the broad general

public benefit stemming from the nature of a request as a basis for ordering a district court to conduct *in camera* examination of a contested document.  In *Allen v. C.I.A.*, 636 F.2d 1287, 1300 (D.C.Cir. 1980), the Court of Appeals noted that the requester's interest in the  "document seems in part to be motivated by a desire to determine whether the CIA has frustrated the investigation into or had a role in the assassination of President Kennedy--an event in which the public has demonstrated almost unending interest."  The Court of Appeals found that such a FOIA request, "in an area of great public interest . . . "makes an *in camera* inspection especially appropriate." Id., (footnote omitted).

Similarly, in *Davy* the Court of Appeals noted that, "[t]he district court found that 'Davy's FOIA request and subsequent litigation were intended to compel disclosure of information relating to the activities of a government agency (the CIA) in relation to a significant historical event,' and thus that this factor favors Davy. There can be little question that this factor favors Davy." *Davy* at 1159, quoting *Davy v. C.I.A.*, 496 F.Supp. 2d 36 (D.D.C. 2007). However, as a result of the *Morley v. C.I.A.*, 719 F.3d remand, this Court re-evaluated the public benefit fact and refused to apply its finding, of a public benefit in *Davy*, declaring that the *Davy* Court's "description of the documents at issue does not create a category of records that automatically satisfy the first factor based on a plaintiff's claims of a relationship to the assassination." *Davy v. C.I.A.*, 59 F.Supp, 3d 151, 155 (D.D.C. 2014) ("*Davy 2014*").

In response to this, the Court of Appeals noted that the District Court rejected the idea that *Davy* "create[d] a category of records that automatically satisfy the [public-benefit] factor based on a plaintiff's claims of a relationship to [President Kennedy's] assassination." Id. The Court of Appeals agreed that "a bare allegation that a request bears a nexus to a matter of public concern does not automatically mean that a public benefit is present." Id. at 5.

But Morley's request did not involve "a bare allegation . . . [of] a nexus to a matter of public concern." The request was recognized by the CIA as a request by a professional writer seeking detailed information about matters with a nexus to the assassination of President Kennedy and its investigation. The CIA ultimately waived search fees and copying costs, thereby conceding the subject of the request was a matter of public interest. The CIA recognized the nexus to the Kennedy assassination by attempting to foist the request off on the National Archives and Research Administration ("NARA"). As the Court of Appeals found, "[w]here [the] subject [of a request] is the Kennedy assassination—an event with few rivals in national trauma and in the array of passionately held conflicting explanations—showing potential public value is relatively easy." Id. at 5-6.

3. The Public Benefit Factor Weighs Very Strongly in Morley's Favor

The Court of Appeals observed that "[t]o have potential public value,' Davy, 550 F.3d at 1159, the request must have at least a modest probability of generating useful new information about a matter of public concern. The higher this probability and the more valuable the new information that could be generated, the more potential public value a request has." Morley 2016 at 6.

In finding that Morley's request had potential public value, the Court of Appeals pointed to several basic facts: (1) "Morley has proffered—and the CIA has not disputed—that Joannides served as the CIA case officer for a Cuban group, the DRE, with whose officers Oswald was in contact prior to the assassination;" (2) "Travel records showing a very close match between Joannides' and Oswald's times in New Orleans might, for example, have (marginally) supported one of the hypotheses swirling around the assassination;" (3) The Court of Appeals had "previously determined that Morley's request sought information 'central ' to an intelligence

committee's inquiry into the performance of the CIA and other federal agencies in investigating the assassination." Id., citing *Morley v. CIA*, 508 F.3d 1108, 1118 (D.C. Cir. 2007.[1]

In view of these circumstances, the Court concluded that "there was at least a modest probability that Morley's request would generate information relevant to the assassination or later investigations." Id. While that conclusion requires this Court to now find that the public benefit factor weighs in Morley's favor, a new *ex ante* analysis of Morley's request shows that the weight that should be assigned to the public benefit factor should be increased considerably.

In its last opinion, this Court wrote that "in concluding that this litigation has benefited the public only slightly, if at all, I do not pass any judgment on the importance of information regarding Joannides's relationship with Oswald, the Kennedy assassination, or the Warren Commission." *Davy 2014* at 158. The failure of this Court to undertake that evaluation is of great importance in doing the new *ex ante* analysis mandated by the Court of Appeals.

4. Dan Hardway's Evaluation of the Potential Public Interest

Such an analysis has been done by Dan L. Hardway, Esq. Hardway has been admitted to practice in the United States Supreme Court and several state and federal district courts, including the United States Court of Appeals for the District of Columbia Circuit and the United States District Court for the District of Columbia. Declaration of Dan L. Hardway (Hardway Decl."), ¶ 2.

From July of 1977 until December of 1978 Hardway was employed as a researcher on the staff of the United States House of Representatives Select Committee on Assassinations

---

[1] This third point refers to the critical holding in *Morley* on the CIA's claim that operational files sought by Morley were exempt from disclosure: "We hold that the requirement of § 431(c)(3) that a FOIA request concern "the specific subject matter of an investigation" is satisfied where the investigating committee would have deemed the records at issue to be central to its inquiry."

(HSCA). In that capacity he had a top secret security clearance and, during a major portion of his employment, he had access to uuredacted Central Intelligence Agency (CIA) records. Id., ¶ 4.

Hardway's primary area of responsibility in research for the HSCA was the possibility of any relationship of any nature between the CIA and Lee Harvey Oswald (LHO), with special focus on the CIA's awareness of, and reporting on, his activities in Mexico City. Implicit in that focus was the issue of whether the evidence from Mexico indicated any operational connection between Oswald and the CIA. Id., ¶ 5.

Hardway's research for the HSCA also covered areas related to people of interest, including David Atlee Phillips and William Harvey, among others, and CIA assassination programs. He was also tasked with research and analysis of the response of the CIA's Mexico City Station, Oswald's trip to Mexico City, and to the assassination. Id., ¶ 6.

Hardway's work for the HSCA resulted in many reports, memoranda, and other documents, some of which have been declassified in whole or in part and some of which have been, apparently, either lost or destroyed. His primary work product for the HSCA was as co-author, with Edwin Lopez, of a draft of a section for the HSCA's Final Report on the CIA and LHO in Mexico City, popularly known as the "Lopez Report," which remained classified in full until 1996, and underwent further declassification in 2003. Id., ¶ 7.

The HSCA staff were initially provided with unexpurgated access to CIA documents. In 1977, Hardway worked with CIA files in a small office at CIA  Headquarters, and initially the HSCA staff were provided with full access to every file that they tasked to see in a reasonably prompt manner after the request was made. Id., ¶ 8.

Beginning in May of 1978, the CIA assigned George Joannides to handle liaison with Edwin Lopez and Hardway. In the summer of 1978, Joannides began to change the way file

access was handled. "We no longer received prompt responses to our requests for files and what we did receive no longer seemed to provide the same complete files that we had been seeing. The obstruction of our efforts by Mr. Joannides escalated over the summer, finally resulting in a refusal to provide unexpurgated access to files in violation of the Memorandum of Understanding previously agreed to by the HSCA and the CIA." Id., ¶ 10 (footnote omitted).

During the course of the spring and summer of 1978 Hardway looked into several areas of research which were actively impeded under Joannides's direction. These included back channel communication methods used by the CIA's Mexico City Station, William Harvey's Office of Security files and his continuing relationship with certain Mafia figures, the use of an impulse camera to photograph the Cuban Consulate in Mexico City, missing production from one of the photographic installations that covered the Soviet Embassy in Mexico City as well as the impulse camera at the Cuban Consulate, and David Atlee Phillips's possible involvement in stories about Oswald that appeared after the assassination of John F. Kennedy.  It is this last area that is particularly relevant to the information sought by Mr. Morley in this case. Id., ¶ 11.

Hardway did not do any research aimed at Joannides or his activities in 1963 because during the time he worked for the HSCA in 1977-1978, he was not informed that Joannides had had any involvement with any aspect of the Kennedy case and had no basis to even suspect that he had.  In researching possible connections between post-assassination stories about Oswald and David Atlee Phillips, Hardway did little, if any research  into the DRE "because, among other reasons, "*the CIA had firmly represented to the HSCA that all ties between the DRE and the CIA had been terminated prior to 1963.*" Id., ¶ 12 (emphasis in original).

Hardway's research into what had happened to the photographs produced by an impulse camera aimed at the Cuban Consulate during the time Oswald was alleged to have visited that institution in Mexico City led to a broader inquiry into back channel communications available to the CIA officers in Mexico City in 1963. In particular, he was looking at possible communication methods between the CIA's Mexico City Station and its JMWAVE station in Miami, Florida, and possible records that may have been generated by such methods. His research into this area consistently met stone walls of denial of any information being available. Id., ¶ 13.

One way that communication can occur is by face-to-face meetings. Hardway learned that David Atlee Phillips, contrary to his sworn testimony to the HSCA, had not been in Mexico City at the time of Oswald's alleged visit to that city. He had been on a temporary duty assignment at CIA Headquarters and at the CIA JMWAVE station in Miami. It was shortly before or during, this trip that Phillips was promoted from Chief of Covert Action in Mexico City to Chief of Cuban Operations. In both positions he was responsible for anti-Castro propaganda operations. Hardway wanted to research the question of coordination of propaganda and disinformation operations between the Mexico City and Miami stations but did not make much progress in that area due to Joannides's lack of cooperation and responsiveness. The HSCA was also running out of time to produce its final report. Hardway's recollection is that "at this point my efforts to get the CIA to produce . . . Phillips's travel vouchers, operational files and expense reports also bore little fruit." Id., ¶ 14.

Before Hardway's access was delayed, curtailed, and then cut off, he was able to review CIA 201 files on many of the individuals who had been sources for stories that appeared in the immediate aftermath of the assassination tying Oswald to Castro or the Fair Play for Cuba

Committee ("FPCC").  He was able to establish that most of the sources of the stories were, or

had been, agents or assets used at one time or another by David Atlee Phillips.  Id., ¶ 15.

Before the HSCA's unexpurgated access was cut off by Joannides, Hardway had been

able to document links between Phillips and most of the sources of the disinformation that came

out immediately after the assassination about Oswald and his pro-Castro proclivities.  Hardway

confronted Phillips with those in an interview on August 24, 1978.  "Phillips was extremely

agitated by that line of questioning, but was forced to admit that many of the sources were not

only former assets that he had managed in the late 50's and early 1960's, but were also assets

whom he was personally managing in the fall of 1963.  Phillips was asked, but could not explain,

why the information that came from anti-Castro Cuban groups and individuals pointing to Cuban

connections all seemed to come from assets he handled personally.  He acknowledged that was

the case.  He also acknowledged that back-channel communication methods existed, but denied

that any were used in Mexico City.  An extensive collection of materials Hardway used in

preparation of his interview of Phillips have not been found.  The memorandum on that interview

has not been located in the official records of the HSCA, although a partial copy has been

circulated in the JFK assassination research community.  To the best of Hardway's knowledge, at

the time he left the HSCA, both the preparation materials and the memorandum on the interview

were in the possession of the CIA in their safe room located at the HSCA's offices.  Id., ¶ 16.

Phillips was not questioned about any possible relationship or work with Joannides

because at the time Hardway had no reason to think there could be any connection.  He had no

information that they had ever worked together or in closely related areas of endeavor.  Id., ¶ 17.

The CIA worked hard to discredit Hardway and Lopez with their superiors.  For example,

Scott Breckinridge, Joannides' superior officer, told an HSCA officer that Hardway and Lopez

"'labored under a burden of credibility in the Agency and . . . are so callow that we [the CIA] did not want to trust them with the kind of information that they were seeking.'" Id., ¶ 18 (footnote omitted).

Prof. G. Robert Blakey, the chief counsel of the HSCA, informed the Committee members about the CIA's resistance to the research being done by Hardway and Lopez. He said the kind of information the CIA was concerned about may have been either that they are terribly concerned that "'we are looking into something and will find something wrong,'" or "'we are touching on very sensitive issues of Agency performance and sensitive sources and methods.'" Id., ¶ 19, citing n. 4.

Hardway states that the area of research that seemed to create the most concern was into David Phillips's possible connections with the sources of stories about Oswald's pro-Castro activities after the assassination. He notes the "very interesting" circumstances that the person the CIA brought in to curtail HSCA investigation, Joannides, "was probably the second most knowledgeable person in the CIA about the CIA's 1963 anti-Castro propaganda and disinformation operations." Id., ¶ 29. 20.

Hardway points out that "[t]he CIA has acknowledged that George Joannides was serving undercover in his assignment to work as a liaison with the HSCA." "In other words, the CIA has acknowledged that they hid their HSCA liaison's true identity, and experience as a seasoned disinformation officer, from the HSCA which was investigating the CIA and assigned him, undercover, to work with the primary researchers who were looking into the area about which he was most knowledgeable." Id., ¶ 20, citing n. 5.

It is now known that Joannides was running the propaganda shop at the CIA's Miami JMWAVE Station in 1963. "It is extremely unlikely that [he] could have occupied that position

and not have known, and worked with, Phillips. In addition, in 1963, we now know, [he] was the case officer handling the DRE. "In 1977 the CIA specifically denied that DRE had a case officer assigned when asked that question by the HSCA." HSCA Chief Counsel Blakey requested all the Agency files on the DRE and its members as early as March 1978. That request included a demand that the CIA identify any employees who had, in the period from 1960 to 1964, worked with the DRE. Id., ¶ 21 n. 6. After that initial request for records, at least two additional requests were made in May and July of 1978. The CIA repeatedly assured the HSCA that they had no contact with the DRE in 1963, having severed all contacts in April of that year. Contrary to the CIA's representations, the leaders of the DRE, in interviews with HSCA staff, indicated that they worked with a CIA case officer in 1963. The CIA assured the HSCA they would search their records to try to identify such an officer. The CIA employee who advised the HSCA Chief counsel Blakey that the CIA could find no record of any such case officer was Joannides. Id., ¶ 21.

Hardway notes that "one possible inference from the known data, at this point, is that the CIA brought someone out of retirement who knew where to not let us look and he impeded and, eventually, shut down our research." Id., ¶ 22. Joannides's specific work in regard to Hardway's research was commended by his superior in his annual performance review from 1978. In that review, Joannides was commended for "'the firm position he took with the young investigators'"; that "'if the peculiar nature of the work did not call on Mr. Joannides for all the talents of his wide experience, it nonetheless was his experience and quick perceptions that ensured a superior performance.'"Id., ¶ 22, citing n. 8. According to Chief Counsel Blakey, Joannides' primary task was to deal with the research being conducted by Hardway and Lopez. Id., ¶ 23, citing n. 9.

In addition to being a primary source of stories about Oswald in the days after the assassination, the DRE also had a highly visible encounter with Oswald in New Orleans in September 1963. Joannides' performance evaluation dated July 31, 1963, reports that he has "done an excellent job in the handling of a significant student exile group which hitherto had successfully resisted any important degree of control." Id., ¶ 24, citing n. 10. Hardway asserts that "[a]nyone who is familiar with intelligence agency's disinformation operations and the details of LHO's encounter with DRE in New Orleans cannot help but see the similarities between the two, raising even more serious questions about Mr. Joannides and his role in anti-Castro and anti-Cuban disinformation and propaganda operations in 1963." Id., ¶ 24.

Phillips recruited a group of students in Havana to work against Castro while he was serving under deep cover in Havana in the late 1950's. At the time, the group was known as the Directorio Revolucionario, or DR. Phillips was the DR's first case officer. Id., ¶ 25, citing n. 11. When the DR's leadership fled Cuba in 1960, William Kent ("Kent"), who was very close to Phillips and worked with him, organized them into an effective organization in Florida, known as the Directorio Revolucionario Estudantil, or DRE. Id., citing n. 12. The DRE was headquarter- ed in Miami but had branches in other places, including New Orleans. Id.

The week after the Cuban missile crisis ended in October, 1962, an article appeared in the Washington Evening Star newspaper alleging there were still Russian missiles hidden in Cuba. The story ran with a front page headline. The DRE was the source of the story. Shortly afterward the leader of the DRE appeared on NBC's "Today Show" and claimed to have seen, with his own eyes, nuclear missiles still hidden in caves and hills in Cuba. Id., ¶ 26, citing n. 13.

Most of the funding for the DRE, in the 1960 to 1964 period, was provided by the CIA, but the organization resisted Agency control. Richard Helms ("Helms"), the then-head of the

Agency's covert action arm, met with the leader of the DRE in 1962 after the missile crisis. Helms promised the DRE that he would appoint a case officer who would be personally and directly responsible to him. Helms appointed Joannides. Joannides' work with DRE was considered to have been very good and successful. He began working with the group in late 1962 as case officer for a "student project involving political action, propaganda, intelligence collection and hemisphere-wide apparatus"-- the DRE. Id., ¶ 27. citing n. 14. By January of 1963 he was commended for "resolving complicated problems involving control of an unruly group." Id., citing n. 15.  In July of 1963, his fitness report noted that Joannides "has done an excellent job in the handling of a significant student exile group which hitherto had successfully resisted any important degree of control." Id, n.16.  He was promoted to take over as head of the Political Warfare branch of the CIA's Miami station--in other words, "he became the manager of the propaganda operations and the only organization that we know of that he retained under his direct control was DRE." Id., n. 27.

Joannides's fitness report dated May 15, 1964 covering the period from April 1,1963 to March 31,1964, reveals that in that time frame he had been promoted to head the Covert Action branch of the Miami Station, while remaining the senior case officer for DRE.  The Report praises Joannides for the quality and quantity of his propaganda and political action programs and his "ability to translate policy directives into meaningful action by all of his assets." Id., ¶ 28, n. 18.

In August, 1963, Oswald had an encounter with DRE representatives in New Orleans. That encounter resulted not only in widespread publicity in New Orleans at the time, including newspaper articles, television coverage and radio interviews, it also resulted in the first reports trying to tie Oswald to Castro after the assassination of Kennedy. DRE released their information

the day of the assassination and it was covered in both the Miami Herald and the Washington Post the next day. Id., ¶ 29, n. 19.

The CIA never told the Warren Commission about its support of, and work with, the DRE in 1963. The CIA never told the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities (the "Church Committee") about it. The Assassinations Record Review Board (ARRB) asked the Agency about DRE. The CIA initially told the ARRB the same thing they told the HSCA: the Agency had no employee in contact with DRE in 1963. The ARRB, however, in examination of Joannides CIA personnel file discovered its clear indication that Joannides was the DRE case officer in 1963. Id., ¶ 30, n. 20.

In the early 1960's, Phillips was working at Headquarters where he, along with Cord Meyer ("Meyer"), developed the first disinformation operations aimed at the FPCC. Id., ¶ 31, n. 21. During the Bay of Pigs, Phillips was in charge of anti-Castro propaganda operations at Headquarters. Id., ¶, n. 22. As such, he worked closely with William Kent, who was his counterpart at JMWAVE in Miami. Id., n. 23. Phillips described their working relationship as very close. Id., n. 24. Kent acknowledged that when he was running propaganda operations in Miami, Phillips had been his immediate supervisor. Id., n. 25. He said he was in contact by telephone with Phillips while in that position and that Phillips visited Miami "quite often." He kept Phillips informed of the propaganda operations he was running in Miami. Id., n. 26. Phillips' work on Cuban disinformation continued after his transfer to Mexico City in 1961 until he left Mexico City in 1965. Id., n. 31.

In the fall of 1962, when Joannides was hand-picked by Richard Helms as the DRE case officer, he replaced Ross Crozier ("Crozier") in Miami. Crozier had been brought in earlier as

the DRE case officer to assist Kent. Joannides reported directly to Helms. Id., ¶ 32. n. 28.

Joannides' registered pseudonym was Walter D. Newby. His supervisor was Kent. Id.

At some point between July 31, 1963, and May 15, 1964, Joannides replaced Kent as

chief of covert operations at JMWAVE. While the scant release of documents on Joannides

makes it impossible to pinpoint the time of this, Kent references in JMWAVE files end after

7/25/63. By October, 1963, the files currently available indicate that Kent was then working at

the Covert Action desk of the Western Hemisphere division at CIA headquarters. Id., ¶33, n. 29.

It is reasonable, therefore, to presume that Joannides became the director of covert operations at

JMWAVE sometime between the end of July and the beginning of October,1963 Id., n. 30. As

that director, he is said to have had."'a distinct flair for political action operations and can

translate policy directives into meaningful action programs . . . .'" Id, n. 31. As director of

covert action, Joannides only retained direct responsibility for one operation: the student project

involving "'distribution of printed propaganda, production of radio programs, and the

development of political action programs.'" Id., n. 33.

Hardway summarizes what we now know as follows:

> [T]he DRE originated as the DR under the
> tutelage of David Phillips in Havana in the late
> 1950's. William Kent took over running the group,
> now known as the DRE, once they had fled from
> Havana to Miami. In his position, he was responsible
> to Phillips. Crozier came in to assist Kent with his
> workload. Kent and Crozier were not too successful
> with the hard to control group and Richard Helms
> gave the DRE an officer responsible directly to him
> which officer was Joannides. But Joannides's
> performance evaluations indicate that his immediate
> supervisor, prior to October 1963, was Kent. We do not
> know what working relationship Joannides had with
> Phillips either directly, or indirectly through Kent. It
> is unlikely that Phillips did not continue to be involved
> in, or at least kept apprised of, operations of a group that

he had started and nurtured, both directly and indirectly
which continued to be directly active in his primary area
of responsibility: anti-Castro propaganda. Indeed, it would
be in keeping with what is known if he used that group in
operations against the Fair Play for Cuba Committee, or
that he continued to be involved in disinformation operations
aimed at the group, having designed the first one.

Id., ¶ 34.

On September 16, 1963, the CIA informed the FBI that it was considering action to

counter the activities of the FPCC in foreign countries. Id., ¶ 35. n. 33.  In New Orleans, on

September 17, 1963, Oswald applied for, and received, a Mexican travel visa. Id., n. 34.  On

September 27 Oswald arrived in Mexico City. On that day, and the following day, Oswald, or

someone impersonating him, may have visited the Cuban Consulate.  On those same days, the

Mexico City CIA Station was testing an impulse camera in their photo surveillance operation

aimed at the door of the Cuban Consulate.  Sometime in late September Phillips left Mexico City

on a temporary duty assignment at CIA Headquarters. Id., n. 35. It is at this time that Phillips

was promoted to chief of anti-Castro operations in Mexico City--the Cuba desk. Id., n. 36.  On

October 1 the Mexico City Station sent "bulk materials" to Headquarters by an untraceable

transmittal manifest, Id., ¶ 35. n. 37, in a diplomatic pouch, Id., n. 38 "to be held in registry until

picked up by Michael C. Choaden [David Phillips] presently TDY HQS." Id., 39.  The HSCA

was not able to find out what was in the pouch.  On October 8, 1963, HQ sent a cable to

JMWAVE advising them that Phillips would arrive there the following day for a two day visit.

Id., n. 40.  So, in the fall of 1963, Kent was promoted from JMWAVE to WH/CA in HQ,

Joannides was promoted to Kent's old position in JMWAVE, and Phillips was promoted to the

Cuban desk in Mexico City.  In August, Oswald and DRE had had their encounter with its

resultant publicity in New Orleans.  In September the CIA notified the FBI about exporting their

successful, but unspecified, domestic anti-FPCC operation overseas.  The day after the CIA

notice, Oswald applied for a Mexico visa in New Orleans, standing in line behind an

acknowledged CIA agent, William Gaudet.  Oswald, or someone impersonating him, visited, or

at least appears in the CIA telephone tap records as visiting, the Cuban Consulate on September

27 and 28.  Those days are the days that the CIA Mexico City Station tested an impulse camera

to photograph people using the door of the Cuban Consulate that Oswald would have had to have

used.  The impulse camera generated over ten feet of 16 millimeter film that has "disappeared."

Id., ¶ 35. n. 41.  At the same time, Phillips was TDY at Headquarters where the Mexico Station

sent him an untraceable transmittal manifest with unspecified bulk materials--to be delivered to

him personally.  From HQ Phillips arrived in Miami on October 9 where he spent two days TDY

at JMWAVE in Miami, Florida, the CIA's large covert action station, on his way back to Mexico

City.

These now known facts lead to inevitable questions: Were the promotions rewards for a

successful disinformation operation aimed at the FPCC in New Orleans, an operation that the

Agency thought it could export to Mexico?  While TDY, did Phillips meet with Kent at HQ?

Did he meet with Joannides in Miami?  Did they review the results of a disinformation and

dangle, Id., ¶ 36, n. 42, operation they had just run in Mexico City--their first attempt to export

the successful domestic anti-FPCC disinformation operation?  Did they review the production

from the impulse camera?  Was that camera's production the "bulk material" in the pouch?  We

don't know the answers because the questions were never asked; Joannides shut down the HSCA

investigation into this area before this level of detail could be discovered and connected.  Given

this, a reasonable researcher has to ask whether the Oswald visit in Mexico City was part of an

intelligence operation that had both counterintelligence and propaganda purposes?  It also, in this

context, becomes appropriate to ask whether there has been an active cover-up and whether

Joannides undercover assignment to work with the HSCA was part of that cover-up. Id.

What Hardway has learned from his work for the HSCA, and the information released in

the years since that is related to that work, puts him in a unique position in evaluating the

relevance, importance and potential public value in the information sought by Morley in his

FOIA that led to this litigation. He believes that the information from his declaration set forth

above provides context helpful to the evaluation of the potential public benefit of the information

sought by Morley. Id., ¶ 37.

Hardway asserts that "[w]ithin the context of these now known facts, the potential public

benefit of the information sought by Morley's FOIA request should be clear and obvious. We

live in a time when there is great controversy about the role of intelligence agencies in our

society, where Congressional oversight of those agencies is subject to conflict and debate about

their effectiveness, and where questions linger in regard to the assassination of a popular

president fifty-three years ago. Id., ¶ 38.

Hardway asserts that "[i]n regard to the issues of 1963 there would be great public benefit

to knowing whether LHO had been involved, wittingly or unwittingly, in an intelligence

operation. Even without settlement of that ultimate question, additional information about what

George Joannides was doing in 1963, in particular with the DRE in New Orleans, would go a

long way to providing insight into that ultimate question.  Similarly, being able to explore the

relationship between David Atlee Phillips and George Joannides would benefit the public by

either confirming or disproving vital aspects of the events of 1963." Id., ¶ 39.  Issues relating to

the use of Joannides in an undercover operation while assigned as liaison to the HSCA, were also

addressed in Morley's FOIA request.  Disclosure of that information would be of extreme public

benefit on several grounds. The CIA recently was accused of spying on the Senate Intelligence

Committee. In this case, the CIA has admitted to running an undercover agent in an

investigation of the CIA by a Congressional committee. Any details released about the nature of

that operation would be of great public benefit. Given the subjects the committee researchers

were looking into, and Joannides' hidden background in those events, any revelation of details

regarding what Joannides did in regard to the HSCA investigation or what he was doing with

Phillips in 1963 would benefit the public by clarifying major issues that remain open in regard to

the Kennedy assassination by either alerting the people of this country that the CIA has

subverted Congressional investigations or by helping to assure them that it has not. The CIA

recently admitted in a declassified historical article that they participated in a "benign" cover-up

of facts during the Warren Commission investigation, resulting in extensive traditional and

internet press coverage. Similar public interest abides in whether there was also a cover-up of

facts involving the CIA's work with the HSCA. Disclosure of the information requested by

Morley would also benefit the public by leading to disclosure of information contributing to an

understanding of whether the CIA similarly covered-up information in the investigation

conducted by the HSCA. Confirmation of such a cover-up would benefit the public by

providing, at least, a basis for strengthening oversight of intelligence agencies. Confirmation

that there was not such a cover-up could work towards restoration of trust in both the intelligence

agencies and our government and its democratic institutions. Id., ¶ 40.

    The documents sought by Morley in his FOIA request had the potential for benefit to the

public in all the ways discussed above, as well as in other unenumerated ways. Specifically,

documents that could have provided such potential beneficial information should have been

provided in response to the requests set forth in items numbered 7, 9, 10, 11, 12, 13, 14, and 15

of Morley's FOIA request.  Had these requests yielded documents, they would have been of

great public benefit in clarifying issues in regard to the Kennedy assassination, especially the

roles and possible relationships of Oswald and the CIA and the facts about what actually

happened in New Orleans and Mexico City in the late summer and fall of 1963.  Documents that

could have provided such potential beneficial information should have been provided in response

to Morley's July 4, 2003, request for the records described in items numbered 7, 8, 10, 16 and 17.

Had these requests produced documents, those documents could have been of great public

benefit in resolving issues about whether the CIA subverted the HSCA investigation into the

events in New Orleans and Mexico City and the possibility that there was a relationship between

the CIA and Oswald.  Id., ¶ 41.

From Hardway's perspective, further examples of the possible public benefit of the

documents sought by Morley's request can be seen, from some of the information provided by

the CIA's *Vaughn* index.  While most, if not all, of the documents summarized in the index

indicate they would have information relevant to the issues discussed above, documents

numbered 199978, 1161490, 1153249, 1161488 and 1153248 are of particular interest.  Id., ¶ 42.

Document number 1199978, Id., ¶ 43, n. 43, is an 8/17/1978 Memo for the Record

Reinvestigation of Third Party.  The date of the document indicates that it was generated

between the time Hardway interviewed Barney Hidalgo ("Hidalgo") on 7/28/1978 and David

Atlee Phillips' second appearance before the HSCA in executive session on August 10, 1978.

Hidalgo was interviewed because he had said that he personally knew Maurice Bishop, whom he

said worked for the CIA but was not David Atlee Phillips.  Hardway asserts: "The memorandum

is also dated shortly before my last interview with Phillips on 8/24/1978. A major issue I was

addressing, along with other staff members, was whether Phillips, who was under active

investigation by the HSCA staff, used the name Maurice Bishop either as a pseudonym or as an operational cover name. The *Vaughan* Index Document Description indicates that the document was denied in full because it "contains information about Joannides' (sic) interaction with a third party who was under investigation." Id., ¶ 43, n. 44.

Document number 161490, Id., ¶ 44, n. 45, is Joarmides' 9/20/1978 Fitness Report which was withheld in full. We know that CIA Fitness Reports routinely contain detailed descriptions of the employee's specific duties and activities during the covered period. Hardway states: "This fitness report is written in September of 1978, not long after Joannides began his job undercover as a liaison with the HSCA, a matter of extreme public interest, and very shortly after the staff wrapped up its investigation into Phillips. The *Vaughn* Index Document Description indicates that the document was denied in full because it 's an evaluation of Joannidies' . . . job performance during a certain Agency assignment.' This document is, in my opinion, one of the most vital withheld documents in the JFK case and is of incredible potential public significance. The document, if released, should shed light on the issue of whether the CIA actively sought to subvert the HSCA investigation and help to answer the pressing public question of whether Joannides's 'certainAgency assignment' at that time was to subvert the HSCA investigation." Id., ¶ 44 (emphasis in original).

Document number 1153249, Id., ¶ 45, n. 46 is a Form Discussing Intelligence Methods re Joannides dated 2/9/1978. This document is particularly interesting because, allegedly, at this point Joannides was in retirement. According to the CIA's version of events, Joannides was brought out of retirement in mid-May of 1978 to serve as liaison with the HSCA. If that is so, then what intelligence methods regarding Joannides were discussed or detailed on this form?

The document's public significance is in addressing the CIA's use of Joannides in an undercover operation while he served as liaison to the HSCA. Id., ¶ 45.

Hardway states: "Documents numbered, respectively, 1161488, Id., ¶ 46, n. 47, and 1153248 Id., ¶ 46, n. 48, are another George Joannides Fitness Report (1161488), and another Form Discussing Intelligence Methods re Joannides (1153248), but in the case of these two documents, even the date of the document is withheld.  Given that the CIA has not released Joannides' Fitness Report that would have covered the period when Oswald was in New Orleans interacting with the Joannides-run DRE, the document becomes of extreme public interest and import.  If this document is not the Fitness Report for that time period, then it is still of significance in that it would detail additional information about Joannides's role and duties in the CIA and his potential involvement with other persons of interest in the Kennedy investigation. Similar considerations apply to Document number 1153248." Id., ¶ 46.

The photograph of George Joannides that Morley did obtain through his FOIA request would have been invaluable had it been available to the HSCA  staff in 1977 and 1978.  The CIA repeatedly told the HSCA that they had no contact with DRE in 1963.  The leaders of the DRE, however, told members of the HSCA staff, that they had a CIA case officer in 1963 who went by the name of "Howard." Id., ¶ 48, n. 49.  Had the HSCA staff had that photograph in 1978 it would have led to an identification of George Joannides then.  Morley, after obtaining the photograph through his FOIA request, showed the photograph to three surviving members of the DRE, Luis Rocha, Jose Antonio Lanuza, and Manuel Salvat, who each, individually and separately, identified the photograph as the CIA case officer known to them as "Howard" in 1963. Id., n. 50.  The identification of the photograph provides independent confirmation of

Joannides' assignment in 1963 and prevents further prevarication on the issue by the CIA, thereby settling an issue of significant public interest in the JFK investigation. Id., ¶ 48.

After Phillips testified in executive session a second time, on April 25, 1978, several staff members, including Hardway, sought to have the Chief Counsel recommend to the Committee that it refer Phillips to the Justice Department for prosecution for lying to Congress. That was not done. While recommendations were made to the Justice Department at the close of the Committee's work regarding further investigations, none of the recommendations referred to Phillips or his activities. Hardway states: "Had we known then what we have learned since 1978 about Phillips 's and Mr. Joannides's activities, I firmly believe that the results would have been much different than they were. I believe that, at a minimum, the information would have led to a Lying to Congress charge against Phillips and a strong recommendation that the activities of the CIA, George Joannides, David Atlee Phillips and Lee Harvey Oswald in New Orleans, Dallas and Mexico City be subjected to further, additional, intense investigation. Such is the nature of the information. Consequently, I think it should be clear that the information sought by Morley in his July 4, 2003, FOIA request that specifically dealt with the underlying facts from 1963 and the CIA's active cover-up of that information in 1978, are of the greatest possible public interest. While revelation of that information cannot have the same effect it would have had in 1978, or 1963, it continues to be of great historical interest as well as being of great practical and political import to the nature and functioning of our democracy." Id., ¶ 49.

5.  Summary of Weight to be Accorded Public Benefit Factor

As noted above, considered from the *ex ante* perspective as mandated by the Court of Appeals, the potential public benefit of Morley's request is not just "modest," the standard which the Court of Appeals said Morley met, but extremely strong. The potential public benefit applies

to many aspects of Morley's request, and it goes emphatically to the core public issue of

democratic accountability by raising questions about whether the CIA violated the law by

covertly undermining the work of a congressional investigation into aspects of the Kennedy

assassination inquiry which the CIA was itself under investigation for possible misconduct.

Balancing the potential public benefit factor, this Court should give it maximum weight.

## C. The Three Remaining Factors Favor Morley

Finally, the Court of Appeals noted that "[f]ollowing the prior remand on the fees issue,

the district court declined to reevaluate any factors other than public benefit, or to rebalance the

factors, despite this court's suggestion in *Davy* that the first three factors are all addressed to the

distinction 'between requesters who seek documents for public informational purposes and those

who seek documents for private advantage.'" *Davy*, 550 F.3d at 1160.  In light of this, the Court

instructed that "[o]n remand, the district court should consider the remaining factors and the

overall balance afresh." *Moley 2016* at 7.

### 1. The Second and Third Factors Strongly Favor Morley

What the Court of Appeals referred to in summarizing the test set forth in the first three

factors is the following statement:

> Essentially, the first three factors assist a court in
> distinguishing between requesters who seek
> documents for public information purposes and
> those who seek documents for private advantage.
> The former engage in the kind of endeavor for which a
> public subsidy makes some sense, and they typically
> need the fee incentive to pursue litigation; the latter
> cannot deserve a subsidy as they benefit only themselves
> and typically need no incentive to litigate.

*Davy* at 1160.  In the same passage, it elaborated further on this theme:

> . . . the court has long recognized that "news interests,"

> regardless of private incentive, generally "should not be
> considered commercial interests" for purposes of the
> second factor, *Tax Analysts,* 965 F.2d at 1096; *Fenster v.*
> *Brown,* 617 F.2d 740, 742 n. 4 (D.C.Cir. 1979)
> (quoting S.REP. NO. 93-854, at 19), and that
> "a court would generally award fees if the
> complainant's interest in the information sought
> was scholarly or journalistic or public-interest
> oriented, [unless] . . . his interest was of a frivolous
> or purely commercial nature," *Fenster,* 617 F.2d
> at 742 n. 4 (quoting S.REP. NO. 93-854, at 19);
> *Tax Analysts,* 965 F.2d at 1096.

*Davy* at 1160-1161.

Given this holding, this Court must re-evaluate the second factor as strongly favoring

Morley. He is a journalist and scholar who falls with the category of requesters favored to

"generally" receive awards of attorney fees. His efforts to obtain information in this case cannot

by any stretch of the imagination be considered "frivolous" or "purely commercial."

*Davy* reversed and remanded this court's decision in *Davy v. C.I.A.*, 496 F.Supp.2d 36

(D.D.C. 2007) ("*Davy 2007*"). In that case this court ruled that the second and third factors did

not favor an award of attorney's fees because the plaintiff was a book author who used the

documents he obtained to research a book which he later published, and "[a]lthough the book is

now out of print and was, presumably, a limited commercial success, Davy's interest in the

records was clearly commercial." *Davy 2007* at 38. In response, *Davy* roundly criticized *Davy*

*2007*'s findings, saying that even if this court had been correct about the book, "such scholarly

interest are not 'clearly commercial' under this circuit's precedents." Davy pointed to the fact

that his requests was "for information related to the agency's QKENCHANT and ZRCLIFF

projects, which were based on his interest in the agency's alleged involvement in the

assassination, *Davy I,* 456 F.3d at 163, [and] reflect more of a scholarly than a disqualifying

commercial interest." *Davy* went on to state: "The record indicates not only that Davy has also

published magazine articles on the assassination but that some of the information released to him under FOIA had not previously been made public." And *Davy* noted that "[t]here is no suggestion in the record that his requests were frivolous. In fact, Davy's unchallenged declaration makes clear the substantive value of the released documents and the agency has not meaningfully argued otherwise even on appeal." *Davy* at 161.

All of these points closely parallel the circumstances presented by this case. There is no dispute that Morley is a journalist and a scholar who has written books and articles on significant historical topics related to the JFK assassination. There is no dispute that he received very minor income from magazine articles he wrote on Joannides which were presented in the context of the JFK assassination.

Under the *Davy* standard, the second and third factors unequivocally favor an award of fees to Morley.

### 2. The Fourth Factor Favors Morley

The fourth factor "considers whether the agency's opposition to disclosure 'had a reasonable basis in law,'" *Tax Analysts*, 965 F.2d 1092, 1096 (D.C. Cir. 1992) and "whether the agency 'had not been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior.'" *Davy* at 1162 (citations omitted). "If the Government's position is correct as a matter of law, that will be dispositive. If the Government's position is founded on a colorable basis in law, that will be weighed along with other relevant considerations in the entitlement calculus." *Davy* at 1162 (citations omitted).

In its 2007 decision, this Court held "[a]though our Circuit Court held that Davy 'prevailed' in his action, there is no basis to conclude that the CIA unreasonably withheld these requested documents. To the contrary, the CIA agreed to disclose the documents within a few

months of Davy's second FOIA request, and this Court concluded that the CIA's search and

disclosure of information pursuant to that agreement was satisfactory. Accordingly, the final

factor also favors the Government." *Davy 2007* at 38.

In response, the Court of Appeals rejected this claim. It said that "[t]he district court

found that 'there is no basis to conclude that the [a]gency unreasonably withheld these requested

documents.' But this analysis mistakenly shifts the burden to the requester. The question is not

whether Davy has affirmatively shown that the agency was unreasonable, but rather whether the

agency has shown that it had any colorable or reasonable basis for not disclosing the material

until after Davy filed suit." *Davy* at 1162-63.

*Davy* found that the CIA did not reach an agreement to disclose the requested documents

until March 2001, after Davy filed his lawsuit and four months after he filed his second FOIA

request. It also noted that that the agreement to comply with the request coincided with the filing

date for meet-and-confer statements under Local Rule 16 of the district court, and that it took

more than a year for the agency to process and release a moderate quantity of documents. *Davy*

at 163. *Davy* asserted:

> If the Government could defeat an award of fees by
> citing a lack of resistance after the requester files a
> lawsuit to obtain requested documents, then it
> could force plaintiffs to bear the costs of litiga-
> tion. Absent evidence that the agency had a reasonable
> basis for failing to respond to Davy's second request,
> the district court abused its discretion in determining
> that the fourth factor weighed in the agency's favor.

Id.

This is exactly what happened in Morley's case. The CIA initially did not respond to his

request at all. It totally ignored the deadline for making a determination of the request. Four

months after Morley submitted his request, the CIA acknowledged the request. However, it

failed to make a determination of the request as required by the FOIA statute.  Although Morley

had submitted a valid request in compliance with statutory requirements, the CIA did not accept

it, did not make a determination of it.  Instead, the CIA advised Morley that these records had

been "re-reviewed" by the ARRB, after which they were returned to NARA to be made available

to the public.  It then brushed off his request, telling him that he should submit his request to

NARA. *See* Exhibit 2 (Robert T. Herman-Lesar, dated November 5, 2003) Morley's Renewed

Motion for Attorney's Fees, ECF. 135.

The CIA did not assert that *all* records responsive to Morley's request had been

transferred to NARA.  In fact, they had not been. Nor did the CIA assert that it had not retained

copies of, or control over, JFK assassination-related records transferred to NARA. In fact, it had.

Having exhausted his administrative remedies, Morley filed suit on December 16, 2003.

The CIA moved for a month's extension of time to file an answer, stating that based on its

response to the request, "it appears that the subject of plaintiff s FOIA request is associated with

the investigation of the assassination of President Kennedy," and, "[a]s a result, this matter

potentially raises sensitive issues and information which has previously been the subject of other

FOIA requests."  The CIA did not advise Morley as to the nature of "sensitive issues" potentially

involve, did not make any determination as to the exempt status of any records, and did not

invoke the "Glomar" defense.

On February 19, 2004, seven and a half months after Morley submitted his request, the

CIA filed its answer. ECF 2. It wrongly denied 1) the Complaint's allegation that the CIA did

not assert that all records responsive to Morley's request had been transferred to NARA, and 2)

that Morley had exhausted administrative remedies.

On April 9, 2004, the CIA moved to stay proceedings, ECF 7. On September 2, 2004, the District Court entered a Minute Order which granted a stay but ordered that the CIA would have until "December 2004 to complete its processing of [Morley's] FOIA case request." ECF 22.

The CIA's December 15, 2004 status report stated that the "CIA has nearly completed its processing of *all* documents responsive to plaintiffs request and is currently reviewing them to ensure consistency in its processing. CIA expects to complete that process and release *all* non-exempt documents to plaintiff's counsel no later than December 24, 2004." Id. (emphasis added) This misrepresented the facts. The CIA did not release *all* documents responsive to Morley's request as a result of the District Court's December 2, 2004 Minute Order, nor did it release *all* nonexempt records. Neither did it admit to the existence of operational records. It was not until 2008, four years after the request was made and after a victory in the Court of Appeals on the issue that it admitted to the existence of responsive operational records, conducted a search, and released records. It was not until December 2005, a year and a half after Morley filed his request, that the CIA finally made a determination of his request and released some records. Thus, the facts of this case show that as in *Davy*, the CIA has failed to meet its burden of showing that it did not resist the prompt disclosure mandated by the FOIA.

The Court of Appeals rejected this Court's finding that evaluation of the fourth factor favored the CIA. That finding is dispositive here. It requires that this Court's re-evaluation of the fourth factors find, that as in *Davy*, and for the same reasons, it weighs in favor of Morley.

The record reflects many other instances in which the CIA violated the law or engaged in recalcitrant, obstreperous and deceitful behavior. The CIA did not prevail as a matter of law on a number of issues. It did not prevail on the issue of whether it had to process Morley's valid FOIA request itself. It had to release records and information it claimed had been sent to NARA.

It had to concede that Morley was entitled to a waiver of search fees and copying costs. After invoking the "Glomar" defense and taking the fight on this issue all the way to the Court of Appeals, it had to search, review and release operational files and provide a *Vaughn* index of operational files. It had to release information that it initially claimed was exempt from disclosure. For example, it continued to insist on the validity of all of its Exemption 2 claims long after Morley pointed out the need to reevaluate them in light of the Supreme Court's decision in *Milner v. Dep't of Navy*, 131 Supr. Ct. 1259 (2011). In fact, it carried the fight over this issue all the way to the second trip to the Court of Appeals on the merits. And over a period of more than six years it has repeatedly been ruled to have violated the law governing the FOIA's attorney fees provision.

With respect to recalcitrant conduct, the burden is *not* on the plaintiff to "affirmatively show[] that the agency was unreasonable"; rather, the burden is on the agency to show that it had "any colorable or reasonable basis for not disclosing the material until after [the plaintiff] filed suit." *Davy* at 1163. The fact that the record contains many examples of such conduct greatly strengthens the degree to which the fourth factor weighs in Morley's favor, but given the findings in *Davy* and the parallel facts in this case, there is no doubt that this factor already weighs very heavily in Morley's favor.[2]

D. An Overall Balancing of the Four Factors Strongly Favors Morley

*Morley 2016* ordered that, "[o]n remand, the district court should consider the remaining factors and the overall balance afresh." Id. at 7.

---

[2] All motions, oppositions, response, replies, surreplies and supplemental memorandum related to the attorney fees issue and all declarations, exhibits, attachments and other materials pertinent to them are hereby incorporated herein by reference.

The majority opinion in *Davy* concluded with a statement of its ultimate finding on the four factors standard:

> Accordingly, because the record reflects that he
> is the type of requester Congress contemplated when
> it sought "to lower the 'often . . . insurmountable
> barriers presented by court costs and attorney fees to
> the average person requesting information under the
> FOIA,'" *Tax Analysts,* 965 F.2d at 1095 (quoting
> *Cuneo,* 553 F.2d at 1363-64), *and because no factor
> weighs in the agency's favor, a balancing of the factors
> can only support the conclusion that* Davy *is entitled
> to an award of attorney's fees.*

*Davy* at 1164.   In light of this, the Court of Appeals stated that "we reverse and remand the case only for the district court to enter an appropriate order awarding fees and costs as to all matters on which Davy prevailed." Id. 1163

In light of the foregoing passage from *Davy*, it is clear that a fresh balancing of the four factors requires the same result as in *Davy. As in Davy*, all four factors favor an award of attorney fees to Morley.


III. THE AMOUNT OF ATTORNEY'S FEES SOUGHT IS REASONABLE

A. Determining the Amount of Compensation

In *Hensley v. Eckhart*, 461 U .S. 424, 435 (1983, the Supreme Court stated:

> [P]laintiff' s claim for relief will involve a common
> core of facts or will be based on related legal theories.
> Much of counsel's time will be devoted generally
> to the case as a whole, making it difficult to divide
> the hours expended on a claim by claim basis. Such
> a lawsuit cannot be viewed as a series of discrete claims.

Id. at 435. "In the same case, the Supreme Court has also stated that 'the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.'" *Oglesby v. Dep't of Army, et al.*, Civil Action No. 87-3349. March 24, 1999, Report and Recommendation of Magistrate Judge Facciola at 15, *(subsequently not adopted for unrelated reasons)*, quoting Id. "Similarly, this circuit's opinions reflect the same analysis and have held that a plaintiff's failure to prevail on one count is not itself a sufficient ground for reducing fees. It is the plaintiff's overall success and not the number of counts 'won' that matters." Id., citing *Goos v. National Association of Realtors*, 68 F .3d 1380, 1386 (D. C. Cir. 1995) ("[K]ey question is whether the work was reasonably done in pursuit of the ultimate result.").

A FOIA case, unless joined with other distinct claims normally constitutes a single claim for nonexempt information.

B. The Issue of the JFK Records at NARA

In discussing this court's position that Morley is not entitled to fees for obtaining records "publicly available" at the NARA, the Court of Appeals noted that "unlike the requester in *Tax Analysts*, who sought publicly available tax decisions, Morley had no reason to believe that all records pertaining to Joannides would be available." *Morley 2016* at 6. The Court went on to note:

> Moreover, at oral argument Morley's counsel
> claimed that extracting documents of this sort from
> the Archives is a laborious and unreliable process
> —and that some documents in the Archives cannot
> be electronically located because of missing record
> identification forms, which record information
> about each document for input into an electronic
> database.

Id. at 6-7.

The evidence on this issue already is in the record of this case.  With the exception of the

circumstances in *Tax Analysts* records are not publicly available to FOIA requesters if you have

to sue to get them.  While claiming that the Joannides records were "publicly available" at

NARA's JFK Act Collection, the CIA has never submitted a declaration substantiating under

oath its claim.  It has simply relied upon testimony of counsel.  Morley has submitted  sworn

testimony addressing some of the problems.

> On another aspect of the CIA's efforts to diminish the public
> benefit achieved by this lawsuit, the CIA says that the 1,112 pages
> of records released to me from the President John F. Kennedy Assassination
> Records Collection Act at [NARA] were merely duplicative in nature
> and therefore did not constitute "new information" whose disclosure
> benefitted the general public.  The CIA's brief gives the impression that
> these documents are available on NARA's website.  This is misleading.
> What is available on NARA's web site is not the documents themselves
> but a "RIF" or "Record Identification Form" which provides a
> minimal description of some information pertinent to the document,
> sometimes including the date, origin and number of pages in the
> document. But the NARA web site does not summarize the contents
> of the document and the documents are not accessible online. The records I
> obtained from the CIA documents transferred to NARA were made available
> to me, and through me to the public, only because the CIA recognized the
> public interest in their disclosure and the lack of general public availability
> and thus furnished them to me without cost.  But for the success of this
> lawsuit, this information would have remained, for all practical purposes,
> unavailable to the public.

Eighth Declaration of Jefferson Morley, ¶ 6.  ECF 117-3.


The Court of Appeals panel raised a second issue with respect to these records.  It said

that "[b]efore denying any fees on the ground that some of the documents were available in the

Archives, the district court should consider (1) whether fees incurred in connection with such

documents are segregable and, if so, (2) whether the difficulties recited above nonetheless

militate against denial of fees for such documents."  Id. at 7.

The answer to the first question is that segregability is not possible. The NARA documents were released to Morley only because he won a victory in the Court of Appeals on this issue. They were not available to Morley under the FOIA except for his having prevailed on the issue in the Court of Appeals. As to the second issue raised, if any segregability were feasable, and Morley does not believe that it is, the laboriousness and cost of such efforts would "militate against denial of fees for such documents."

C. Determining the Lodstar

*Blum v.* Stenson, 465 U.S. 886, 888 (1984) held that "[t]he initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate."(quoting *Hensley v.Eckerhart*, 461 U. S. 424 (1983). Once the fee applicant has established this "lodestar" amount, the burden shifts to the opposing party to identify any unwarranted expenditure of time.

Both Dan Alcorn and James H. Lesar have submitted supplemental declarations containing itemizations of the time each considers he reasonably expended in this case. Both contend that their fees should be calculated at the so-called *SalazarLaffey* matrix rate, also known as the Legal Services Index ("LSI"), rather than at the rate used by the United States Attorneys Office *Laffey Matrix*. The following section discusses the merits of employing this rate.

D. The Salazar Laffey Matrix or Legal Services Index Establishes
   a Reasonable Hourly Rate for the Services Rendered

Plaintiff seeks compensation at an hourly rate determined by the *Salazar "Laffey* Matrix," which sets forth hourly rates for attorneys' services adjusted annually. Courts in this district have used a *Laffey* Matrix updated by the legal services index component of the Consumer Price Index ("CPI") in the award of attorneys' fees under the FOIA ("LSI matrix"). On December 18, 2015

the U.S. Court of Appeals in the District of Columbia Circuit held that the *Salazar* "LSI" matrix for attorneys fee rates is the appropriate matrix to determine fee awards for complex federal litigation in this Circuit. *Salazar v. District of Columbia*, D.C. Cir. No. 14-7035 (Dec. 18, 2015). Subsequently this court has used the *Salazar* LSI Matrix to award fees in a Freedom of Information Act case. *CREW v. Dep't of Justice*, Civil Case No. 11-0374 (D.D.C. Feb. 11, 2016). Plaintiff Morley seeks an award of fees using the LSI matrix.   Circuit precedent establishes that this is the appropriate rate to be used to calculate fees in this case involving complex federal civil litigation.

The declaration of economist Michael Kavanaugh describes the LSI matrix that was relied on by this court (Judge Kessler) in *CREW v. Dep't of Justice*, Civil Action No. 11-0754, ECF 55-11, to updated LSI index.  A copy of the Kavanaugh declaration is attached hereto.  A copy of the Salazar Laffey Matrix used in the *Crew* cases to calculate the fees in those cases is attached to the Kavanaugh declaration as attachment 3 thereto.  It is also relied upon in this case.

As explained by Dr. Kavanaugh in his declaration, the *Salazar* Matrix is a more accurate measure of market rates for attorneys' fees in complex federal litigation, because it contains as the updating component the measure of the cost of legal services called the Legal Services Index. By contrast, the United States Attorneys Office ("USAO") *Laffey* Matrix does not contain the legal services component.  It relies instead on the Consumer Price Index for the Washington Baltimore region.  That index, however, is based on the cost of a broad array of consumer items.

    E.  The Lodestar Should Be Adjusted Upward to Account for
       Delay in Receipt of Payment and Lost Opportunity

The FOIA's attorney's fees provision provides for an award of a "reasonable" attorney's fee. In *Missouri v. Jenkins*, 491 U.S. 474, 484 (1989), the Supreme Court dealt with this issue in the context of an application under § 1988 of the Civil Rights Act.  It held: "An adjustment

for a delay in payment is, we hold, an appropriate factor in the determination of what constitutes a reasonable attorney's fee under § 1988."

An adjustment upwards for delay is especially warranted in this case because of both the extraordinary delay involved and the fact that the delay is substantially attributable to the fact that the CIA is now litigating this issue for the fifth time in this case—twice in the Court of Appeals and three times in this Court.

The amount of upward adjustment that is appropriate will differ based on whether this Court applies the *Salazar* matrix or the USAO's *Laffey* matrix to set the appropriate rate. Accordingly, plaintiffs request that after the Court renders its decision on the pending motion it permit Morley to submit supplemental declarations detailing the amount of such an upward adjustment that is appropriate and the basis therefore.

F.  The Amount of Fees Sought

Attorney Lesar's 2016 Supplemental Declaration has a chart showing the amount of fees he has reasonably incurred on an annual basis according to the *Salazar Laffey* matrix rate. The total is $821,186.20. This chart does not reflect certain time that has been excluded. That time has been crossed out on the time itemization sheets that are attached to his declaration.

In an exercise of billing judgment, he is reducing this figure by 10% or $82,118.62, leaving a total figure of $739,067.58. In an effort to encourage settlement, he is reducing this amount by another 5% or $36,953.38. This leaves a total of $ 702,114. 20.

Attorney Dan Alcorn has submitted a supplemental declaration with an itemization of his fees calculated at the *Salazar Laffey* marix rate. His total of fees reasonably incurred comes to $39,210.60.

Both attorneys will supplement these figures at a later date to account for fees subsequently incurred. Costs will also be submitted at that time.

CONCLUSION

For the reasons set forth above, the Court should award Morley attorney's fees and costs in the amounts set forth above.

Respectfully submitted,

James H. Lesar #114413
930 Wayne Ave., #1111
Silver Spring, Md 20910
Phone: (301)328-5920

Counsel for Plaintiff

Dated: May 11, 2016

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JEFFERSON MORLEY,     :
           :
   Plaintiff,     :
           :
  v.         :  Civil Action No. 03-2545 (RCL)
           :
CENTRAL INTELLIGENCE AGENCY :
           :
           :
   Defendant    :

## O R D E R

Upon consideration of Plaintiff's supplemental memorandum in support of an

award of attorney fees and costs, defendant response thereto, and the entire record

herein, it is by this Court this _____ day of _____, 2016, hereby

   ORDERED, that plaintiff's motion be, and hereby IS, GRANTED, and it is

further ORDERED, that attorney James H. Lesar is awarded $_____,

and $ _____ in costs; and that attorney Dan S. Alcorn is awarded

$_____, and $ _____ in costs.



       _____
       UNITED STATES DISTRICT JUDGE